**Opinion filed October 31, 2013**



In The

# Eleventh Court of Appeals

_____

## No. 11-11-00288-CR

_____

**CHARLES E. BUTCHER II, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 403rd District Court**

**Travis County, Texas**

**Trial Court Cause No. D-1-DC-11-904064**

## M E M O R A N D U M   O P I N I O N

The jury found Charles E. Butcher II guilty of aggravated kidnapping and assessed punishment at confinement in the Institutional Division of the Texas Department of Criminal Justice for life and a fine of $10,000. *See* TEX. PENAL

CODE ANN. § 20.04 (West 2011). The trial court sentenced Butcher accordingly. We affirm.

Butcher presents seven issues for review. In his first issue, Butcher asserts that the trial court erred when it admitted physical evidence seized from Butcher's apartment and pickup because the evidence was obtained as a result of his illegal detention. Butcher complains in his second and third issues that the trial court erred when it admitted hearsay testimony by two police officers. In his fourth issue, Butcher argues that the trial court erred when it compelled him to submit to the photographing of his tattoos. Butcher alleges in his fifth and six issues that the evidence was legally and factually insufficient to support the jury's finding that he did not release the victim in a safe place. And, in his seventh issue, Butcher asserts that the trial court erred when it admitted evidence of his prior conviction from Korea.

The evidence at trial showed that J.G., a nine-year-old girl, was walking to the bus stop when a man came up behind her and grabbed her by putting one arm around her waist and his other hand over her mouth. He was wearing black gloves. He put her in the front passenger floorboard of his pickup and drove her to his apartment. J.G. testified that the pickup was old and red and had a white cover over the bed. J.G. also testified that the man had a kitchen knife in his hand and told her that he would cut her if she screamed.

At his apartment, the man put her in the bedroom closet, and she watched "SpongeBob." J.G. told him she was hungry on two separate occasions, and on each occasion, he fed her. The man fed her bread with jelly the first time she asked for food and ravioli the second time she asked for food. J.G. also told him that her mother would get mad if she was not home by the time she normally came home from school. The assailant put her back in the floorboard of his pickup and drove her to the apartments next to where she lived. She told him that she did not know

2

how to get home from that location. The man drove her back to the street where he initially grabbed her, and she walked home.

J.G.'s mother was not at home when J.G. got there. Because J.G.'s assailant had taken her cell phone and because she did not have a home phone, she went to her neighbor's house to use the neighbor's phone to call her mother. Her mother and several officers arrived, and the police began an investigation.

J.G. described her assailant's apartment as a one-bedroom apartment that was upstairs in a red brick building. The apartment complex was under construction. She testified that the apartment was decorated with a Harley-Davidson theme; "[t]here was Harley-Davidson everywhere." J.G. also testified that she remembered telling the woman at the Children's Advocacy Center that the man had one tattoo with a black miniature tiger on one arm and another tattoo with a skull and bandana that said "Seek and" with a third word.

The police identified Butcher as a suspect, and they later arrested him. The police searched his apartment and pickup and seized several items, including a paring knife and eating utensils. The police also photographed Butcher's pickup and apartment.

J.G. identified photographs of the knife found in Butcher's pickup as the knife her assailant used to threaten her. She also identified photographs of the outside and inside of Butcher's pickup, of the white camper shell that was on his pickup, of the Harley-Davidson floor mat in his pickup, and of the Harley-Davidson sticker on the back window of the camper shell. In addition, she identified photographs of the closet and living room of Butcher's apartment as the place where she was taken. Other photographs taken by police during their investigation showed bread, jelly, and cans of ravioli in Butcher's kitchen.

A forensic analyst testified that J.G.'s DNA was found on the paring knife from Butcher's pickup and on the blue spoon in Butcher's kitchen sink. J.G. could

not be excluded as a contributor to the DNA found on a pair of black and gray gloves. The analyst also testified that Butcher could not be excluded as a contributor to the DNA found on the spoon, several other items recovered from his kitchen, the black and gray gloves, and a pair of black fingerless gloves.

In his first issue, Butcher contends that the trial court erred when it admitted the DNA evidence and other physical evidence, such as the knife and the spoon, because the evidence would not have been found if the police did not exploit his illegal arrest. Specifically, Butcher argues that, if he had not been illegally arrested, he would have been at home cleaning his apartment and pickup, and the police would not have found the items later that day when they searched his property. Butcher does not challenge the trial court's finding that the warrants to search his apartment and pickup were supported by probable cause.

The trial court held numerous pretrial hearings on the suppression issue. The evidence during the hearings showed that Austin Police Officers Troy Boddy and Kevin Rybarski of the criminal intelligence unit conducted surveillance of Butcher once he became a suspect in the kidnapping investigation. During their surveillance, they followed Butcher to Walgreen's and observed Butcher commit four traffic violations: he failed to signal an intent to turn left on three separate occasions and made an improper turn on one occasion. *See* TEX. TRANSP. CODE ANN. §§ 545.101, 545.104 (West 2011). The officers did not conduct a traffic stop because they were in an unmarked vehicle. However, the officers did approach Butcher when he stopped at Walgreen's and told him that they observed him commit the traffic violations. The officers also informed him that a detective wanted to speak to him regarding an open investigation. They asked him if he would go to the police station with them to talk to the detective.

Butcher went to the police station with the officers and spoke with Detective Christopher Douglas Keen of the Austin Police Department's child

4

abuse unit. Upon entering the interview room, Detective Keen read Butcher the *Miranda*[1] warnings and told him he was not free to leave. Butcher waived his rights and spoke with Detective Keen for approximately one and one-half hours before requesting an attorney and ending the interview.

At the end of the interview, Detective Keen executed an arrest warrant on Butcher for failure to register as a sex offender. Later that day, a magistrate signed an arrest warrant for aggravated kidnapping and also issued search warrants for Butcher's apartment and pickup. Officers executed the search warrants and found physical evidence linking Butcher to the kidnapping. The next day, an order of commitment was filed for the aggravated kidnapping offense.

The affidavit supporting the arrest warrant for failure to register as a sex offender contained a statement by Officer Mike Summers that Butcher had "not appeared in person to the Austin Police Department's Sex Offender Registration Unit to register as required." However, Nazareth Munoz, an employee of the Austin Police Department who registered sex offenders, testified that Butcher had appeared and had begun the registration process by completing the required form. The registration form was contained in the file that Officer Summers reviewed before preparing his affidavit. Butcher argued that Officer Summers knew that the statement was false or that he made the statement with a reckless disregard for the truth and that, therefore, under *Franks v. Delaware*, 438 U.S. 154 (1978), the warrant should not have been issued.

The trial court suppressed Butcher's arrest for failure to register, but denied Butcher's motion to suppress as to the physical evidence seized from his apartment and pickup. The trial court entered the following findings of fact and conclusions of law: (1) Officers Boddy and Rybarski observed Butcher commit three traffic violations; (2) Butcher voluntarily accompanied the officers to the police station;

---

[1]*Miranda v. Arizona*, 384 U.S. 436 (1966).

5

(3) Butcher made statements to Detective Keen after he was given *Miranda* warnings; (4) Butcher ended the interview at his own request; (5) the search warrant affidavits for Butcher's apartment and pickup were based on facts and circumstances within Detective Keen's knowledge at the time of the interview; (6) Butcher was under arrest at the time Detective Keen read him the *Miranda* warnings; (7) the statements that Butcher made to Detective Keen prior to his request for an attorney are admissible; (8) Butcher freely and voluntarily made the statements; (9) the arrest for failure to register is suppressed; and (10) the affidavit provided probable cause to support the issuance of the warrants to search Butcher's apartment and pickup. The trial court did not expressly address Butcher's argument that the evidence was found as a result of his illegal detention.

We review a trial court's ruling on a motion to suppress under a bifurcated standard of review. *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000). We give great deference to the trial court's findings of historical facts as long as the record supports the findings. *Guzman v. State*, 955 S.W.2d 85, 87 (Tex. Crim. App. 1997). Because the trial court is the exclusive factfinder, the appellate court reviews evidence adduced at the suppression hearing in the light most favorable to the trial court's ruling. *Carmouche*, 10 S.W.3d at 327. We also give deference to the trial court's rulings on mixed questions of law and fact when those rulings turn on an evaluation of credibility and demeanor. *Guzman*, 955 S.W.2d at 87. Where such rulings do not turn on an evaluation of credibility and demeanor, we review the trial court's actions de novo. *Id.*

The Texas exclusionary rule prohibits the State from using evidence against the accused that was obtained in violation of the law. TEX. CODE CRIM. PROC. ANN. art. 38.23 (West 2005). If the evidence seized is sufficiently attenuated from the violation of the law, the evidence is not considered to be obtained in violation of the law. *Johnson v. State*, 871 S.W.2d 744, 750 (Tex. Crim. App. 1994). To

determine whether the discovery of physical evidence is attenuated from the violation we consider three factors: (1) the temporal proximity of the arrest and the seizure of physical evidence, (2) the presence of intervening circumstances, and (3) the purposefulness or flagrancy of the police misconduct. *State v. Mazuca*, 375 S.W.3d 294, 301–07 (Tex. Crim. App. 2012).

Here, Butcher argues that, if he had not been illegally arrested by Detective Keen for failure to register as a sex offender, he would have been at home cleaning his apartment and pickup, and the police would not have recovered evidence linking him to the crime. Under the first factor, there was no temporal separation between the illegal detention and the seizure of evidence. Butcher was under arrest for failure to register as a sex offender at the same time that the police searched his apartment and pickup. Thus, the temporal proximity factor weighs in favor of suppression.

The trial court found that the warrants to search Butcher's apartment and pickup were supported by probable cause. Butcher does not contest this finding on appeal. Thus, the search warrants constitute an intervening circumstance that breaks the causal connection between the illegal arrest and the seizure of physical evidence. The second factor weighs against suppression.

As to the third factor—purposefulness or flagrancy of police conduct—the record shows that Detective Keen arrested Butcher under a warrant issued by a neutral magistrate. The record does not show that Detective Keen knew that the statement in the affidavit for the warrant was false or that he otherwise acted in bad faith when he executed the warrant. In addition, prior to Detective Keen arresting Butcher for failure to register as a sex offender, Officers Boddy and Rybarski could have arrested Butcher for the traffic violations he committed within their view. Furthermore, Detective Keen had probable cause to arrest Butcher for kidnapping at the time of the interview. Detective Keen knew that Butcher, his

pickup, and his apartment complex matched the descriptions given by the victim. He also knew that officers saw a paring knife in Butcher's pickup that matched the victim's account of being threatened with a kitchen knife. Thus, the third factor weighs against suppression.

This case also presents a unique set of circumstances that, when reviewed as a whole, weigh against suppression. Butcher voluntarily went to the police station to talk to Detective Keen. The station was approximately twenty to thirty minutes away from Walgreen's, where Butcher left his motorcycle. Even if Detective Keen had let him go within minutes of his arrival, he would have had to find transportation back to Walgreen's. Butcher testified that his plan was to leave Walgreen's, go to the dollar store to purchase cleaning supplies, and go back home to clean. Thus, after he secured a ride back to Walgreen's, he still would have had to go shopping for supplies before he was able to return home to clean. The evidence showed that Butcher arrived at the police station shortly before noon. The search warrants were executed between 4:00 and 5:00 p.m. It is a matter of pure speculation as to whether Butcher would have in fact had time to clean his apartment and destroy all of the evidence linking him to the crime. In addition, had Officers Boddy and Rybarski arrested Butcher for the traffic offenses he committed within their view, he would have been legally detained and would not have been able to clean his apartment and pickup prior to the execution of the search warrants.

We conclude that the seizure of the evidence from Butcher's apartment and pickup was sufficiently attenuated from the arrest so as not to require its exclusion. Even if the seizure of evidence was not sufficiently attenuated from the illegal arrest, we decline to extend the exclusionary rule to protect or encourage criminal activity in the form of destroying evidence. *See Segura v. United States*, 468 U.S. 796, 816 (1984). We overrule Butcher's first issue.

In his second and third issues, Butcher argues that the trial court erred when it admitted hearsay testimony by Officer Ruben Velasquez and Detective Keen regarding the description of Butcher's person, vehicle, and apartment and when it admitted hearsay testimony by Detective Keen regarding specific items found in Butcher's apartment.

We review a trial court's decision to admit or exclude evidence under an abuse of discretion standard. *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g). We will reverse a trial court's ruling only if it is outside the "zone of reasonable disagreement." *Id.*

An officer is permitted to testify as to how he proceeded in the investigation based on general information the officer received. *Poindexter v. State*, 153 S.W.3d 402, 408 n.21 (Tex. Crim. App. 2005). However, unless the officer's conduct has been challenged at trial, details of the information the officer received are considered hearsay and are inadmissible. *Id.* "[T]estimony that the officer acted upon 'information received' or words to that effect should be sufficient." *Schaffer v. State*, 777 S.W.2d 111, 115 n.4 (Tex. Crim. App. 1989).

In *Burks v. State*, the Court of Criminal Appeals found that an officer's testimony relating the detailed description of the individual he went looking for after talking with the victim and a witness was inadmissible hearsay. *Burks v. State*, 876 S.W.2d 877, 897–98 (Tex. Crim. App. 1994). Here, like the officer in *Burks*, Officer Velasquez and Detective Keen testified to particular details they learned from the victim. Officer Velasquez related the detailed descriptions of Butcher and his pickup that he learned from J.G. Detective Keen related the detailed description of Butcher's tattoos and of his pickup that he learned from J.G.'s forensic interview.

The testimony by each officer went beyond what is permitted to show how the officers proceeded in their investigation. The officers did not testify that they

acted on "information received" or words to that effect, but instead related the detailed information that they had learned from the victim. The officers' testimony was inadmissible hearsay, and the trial court erred when it admitted the testimony over Butcher's objections.

The State also elicited inadmissible hearsay from Detective Keen when the prosecutor asked him whether the discovery of a loaf of bread, cans of ravioli, and grape jelly were important in linking Butcher to the kidnapping. Detective Keen's affirmative reply implied that J.G. had stated that those specific items were in Butcher's apartment. This testimony also went beyond what was permitted to show how Detective Keen proceeded in the investigation. The trial court erred when it allowed the State to elicit indirect hearsay from Detective Keen.

Having determined that the trial court erred, we must now determine whether the error is reversible under TEX. R. APP. P. 44.2(b), which applies to nonconstitutional errors. Pursuant to Rule 44.2(b), an error is not reversible error unless it affects a substantial right of the defendant. A substantial right is affected when the error has a substantial and injurious effect or influence in determining the jury's verdict. *Johnson v. State*, 43 S.W.3d 1, 4 (Tex. Crim. App. 2001); *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). An accused's substantial rights are not affected by the erroneous admission of evidence if the court, after examining the record as a whole, has fair assurance that the error did not influence the jury or had but a slight effect. *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998). When conducting a Rule 44.2(b) harm analysis based upon the erroneous admission of evidence, an appellate court should consider everything in the record, including:

> [A]ny testimony or physical evidence admitted for the jury's
> consideration, the nature of the evidence supporting the verdict, the
> character of the alleged error and how it might be considered in
> connection with other evidence in the case, the jury instructions, the

10

> State's theory and any defensive theories, closing arguments, voir dire, and whether the State emphasized the error.

*Rich v. State*, 160 S.W.3d 575, 577–78 (Tex. Crim. App. 2005).

The hearsay testimony by Officer Velasquez and Detective Keen did not contain any information that was not otherwise before the jury except for Officer Velasquez's detailed description of J.G.'s assailant. J.G. testified that her assailant was a white male with red hair; however, this description was not the same description that Officer Velasquez related during his testimony. Butcher argues that Officer Velasquez's testimony was harmful because it served as a proxy for in-court identification; J.G. did not identify Butcher as her assailant. The State did mention part of the detailed description in its closing argument to show that Butcher matched the description that J.G. gave to the officer. However, even when this testimony is not considered, there is ample evidence to link Butcher to the kidnapping.

A forensic analyst testified that J.G.'s DNA was found on a spoon in Butcher's apartment and on a paring knife in his pickup. The analyst also testified that Butcher could not be excluded as a contributor to DNA found on the spoon and that neither J.G. nor Butcher could be excluded as contributors to DNA found on a pair of black and gray gloves. J.G. also testified as to the unique Harley-Davidson theme of her assailant's apartment and identified photographs of Butcher's apartment as the apartment where she was taken. Furthermore, the trial court gave the jury a limiting instruction that it was only to consider the testimony for the purpose of showing what the officers were looking for and why they acted the way they did in proceeding upon their investigation. Considering the record as a whole, we have a fair assurance that the errors did not influence the jury or had but a slight effect. *See Johnson*, 967 S.W.2d at 417. Butcher's second and third issues are overruled.

11

Butcher argues in his fourth issue that the trial court did not have the authority to order him to submit to the photographing of his tattoos. Butcher acknowledges that the trial court did not violate his Fifth Amendment right to be free from self-incrimination when it compelled him to submit to the photographing. *See Canales v. State*, 98 S.W.3d 690, 697 (Tex. Crim. App. 2003). Butcher has not cited, and we have not found, any authority that stands for the proposition that a trial court cannot compel a defendant to submit to the photographing of his tattoos.

However, even if the trial court erred when it compelled Butcher to submit to the photographing of his tattoos, the error was harmless under Rule 44.2(b). We do not agree with Butcher that such an error should be reviewed under Rule 44.2(a) because we do not believe a constitutional right is violated when a trial court compels a defendant to submit to the photographing of his tattoos.

After considering everything in the record under the Rule 44.2(b) harm analysis as set out above, we conclude that the trial court's order did not affect Butcher's substantial rights. Although the State used the photographs of Butcher's tattoos to link Butcher to J.G.'s description of her assailant's tattoos, the DNA evidence, J.G.'s identification of Butcher's pickup as the pickup used to kidnap her, and J.G.'s identification of Butcher's apartment as the apartment where she was taken provided ample evidence to identify Butcher as J.G.'s assailant. We also note that the photographs themselves were admissible. We overrule Butcher's fourth issue.

In his fifth and sixth issues, Butcher contends that the evidence was legally and factually insufficient to support the jury's rejection of his affirmative defense of safe release. If a defendant shows by a preponderance of the evidence that he voluntarily released the victim in a safe place, the offense is reduced from a first-degree felony to a second-degree felony. PENAL § 20.04(d).

12

Even after *Brooks*,[2] we review affirmative defenses for both legal and factual sufficiency. *Matlock v. State*, 392 S.W.3d 662 (Tex. Crim. App. 2013). In reviewing the legal sufficiency of the evidence to support a jury's rejection of an affirmative defense in which the defendant has the burden of proof, we first look for evidence favorable to the jury's negative finding. *Id.* at 669. When we review the record for favorable evidence, we disregard all contrary evidence unless a reasonable factfinder could not. *Id.* If there is no evidence to support the jury's rejection of the affirmative defense, we must determine whether the affirmative defense was established as a matter of law. *Id.* Only if the affirmative defense was conclusively proven may we conclude that the evidence is legally insufficient to support the jury's rejection of the affirmative defense. *Id.*

In reviewing the factual sufficiency of the evidence to support a jury's rejection of an affirmative defense in which the defendant has the burden of proof, we review the evidence in a neutral light and determine whether the finding is so against the great weight and preponderance of the evidence so as to be manifestly unjust. *Id.* at 670; *Meraz v. State*, 785 S.W.2d 146, 154 (Tex. Crim. App. 1990).

In determining whether the location of the release was a "safe place," we consider several factors: the remoteness of the location, the proximity of help, the time of day, the climate, the condition of the victim, the character of the location and surrounding neighborhood, and the victim's familiarity with the location or neighborhood. *Rodriguez-Flores v. State*, 351 S.W.3d 612, 636 (Tex. App.—Austin 2011, pet. ref'd). "These factors, however, are only aids to be used in deciding whether the evidence, after considering all the surrounding circumstances existent in the case, shows the jury's finding was manifestly unjust." *Harrell v. State*, 65 S.W.3d 768, 773 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd).

---

[2]*Brooks v. State*, 323 S.W.3d 893 (Tex. Crim. App. 2010).

The evidence showed that J.G. was released at the same location that she was kidnapped: on the street leading from her condo to the bus stop. J.G. was familiar with the area because she had been walking down that street to the bus stop every school day for approximately one month. She testified that there was no heavy traffic on the street.

J.G.'s mother testified that they lived in a nice community and that she felt very safe within the community. However, she also testified that she did not feel as safe after her daughter was kidnapped.

Officer Velasquez testified that the area was "desolate," meaning that it was "[s]parsely populated, trees, grass, kind of like sort of country living sort of." He characterized the community as a comfortable, middle class area with no reputation for drugs or violent crime. There was a shopping center nearby that was under construction, but several stores were open, including a nail salon, grocery store, and wine store. There was also a field near the community with trees and pergolas. There had been no reports of wild animals in the area.

When J.G. was released, she was not injured or unable to walk. She was, however, without a phone because Butcher had taken her cell phone from her and did not return it when he released her. She also did not have a home phone that she could use to call for help.

After reviewing the evidence regarding J.G.'s release, we find that the evidence was legally sufficient to support the jury's rejection of Butcher's affirmative defense. J.G. was nine years old, was without a cell phone, and was released in the same spot where she was earlier abducted.

Butcher relies on *Storr v. State* for the proposition that the fact that the victim was released at the same spot from where she was abducted does not support a conclusion that the area was unsafe simply because the offense had occurred at that location. *Storr v. State*, 126 S.W.3d 647, 652–53 (Tex. App.—

14

Houston [14th Dist.] 2004, pet. ref'd). The Fourteenth Court of Appeals found that the evidence conclusively established that the victim had been released in a safe place when the victim was released where he had earlier been abducted. *Id.* However, in *Storr*, the victim was a college student who had been abducted at the post office near his university and returned to the same location. *Id.* He drove his car to his dormitory and went to his dorm room where he found his roommate. *Id.* at 653. Here, the evidence did not conclusively establish that the victim was returned to a safe place. The victim was a nine-year-old girl who was returned to the middle of a street. She did not have access to a cell phone, and there was no access to transportation that could have removed her from the area. In addition, she returned home to an empty house. We find that the circumstances of this case are distinguishable from the circumstances in *Storr*. Based on the evidence, and even if we set aside the fact that the abduction had occurred at the very spot where the victim was released, the jury could have found that Butcher did not release J.G. in a safe place.

We also cannot say, after considering all of the evidence relevant to whether J.G. was released in a safe place, that the jury's finding was so against the great weight and preponderance of the evidence so as to be manifestly unjust. Butcher's fifth and sixth issues are overruled.

In his final issue, Butcher alleges that the trial court erred during the punishment phase of trial when it admitted a judgment of conviction from Korea for rape/endangerment and attempt to abduct a minor. Butcher argues that the conviction was inadmissible because the State did not present sufficient evidence that Korean law was compatible with minimal concepts of due process.

The State, however, did not have the burden to show that the Korean proceeding afforded Butcher the rights guaranteed by the United States Constitution in order for the judgment to be admissible. "Once the State properly

15

introduces a judgment and sentence and identifies appellant with them, we presume regularity in the judgments." *Johnson v. State*, 725 S.W.2d 245, 247 (Tex. Crim. App. 1987). The burden then shifts to the defendant to make an affirmative showing that the judgment is tainted by a constitutional defect. *Id.*

Defense counsel objected to the Korean judgment and argued that, under Korean law, there was no right to confrontation, no subpoena power, no live testimony given in the proceeding, and no indictment by a grand jury. However, Butcher failed to offer any evidence to affirmatively show that the Korean justice system did not afford such rights to the accused. Butcher asserts that the judgment itself "suggests that the criminal proceedings in which it was obtained fell far below what is deemed acceptable in American or Texas jurisprudence." Specifically, he contends that the judgment suggests the proceedings involved a three-judge panel, that the evidence consisted of mainly written reports and witness statements, and that the proceeding was not bifurcated. In addition, Butcher argues that the judgment does not reflect whether he waived his right to a jury trial or whether he was provided with a Korean translator. Although the judgment may raise a question as to whether the Korean criminal proceedings offered Butcher the same protections and rights as guaranteed by the United States Constitution, the judgment does not affirmatively show that the proceedings did not comport with minimal concepts of due process.

Butcher failed to meet his burden of proof on the issue. Thus, the trial court did not err when it admitted the Korean judgment. Butcher's seventh issue is overruled.

We affirm the judgment of the trial court.


JIM R. WRIGHT

CHIEF JUSTICE


October 31, 2013

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
McCall, J., and Willson, J.